Argued October 25, reversed November 16, 1915.

# KINGMAN COLONY IRR. CO. *v.* PAYNE.

(152 Pac. 891.)

**Bills and Notes—Irrigation Project—Contract—Fraudulent Representations.**

1. An irrigation corporation, formed by owners of arid lands, contracted with a contractor to construct an irrigation system in accordance with plans. The contractor agreed to receive payment in notes and mortgages given by the land owners. A land owner executed a note and mortgage on the representation that 55 acres of her 56.12 acres would be irrigated. Under a subsequent contract and plans, only 44 acres could be irrigated, and she refused to execute a new note and mortgage therefor. The corporation knew of the refusal before any work was done by the contractor who performed the subsequent contract. *Held*, that because of the representation, there could be no recovery on the note and mortgage at the suit of the corporation.

**Contracts—Irrigation Project—Abandonment.**

2. The maker, after the plan of the work had been changed without her consent, and she had refused a request to execute a new note and mortgage, to conform to the change, could assume an abandonment of the agreement as to her.

**Contracts—Irrigation—Construction.**

3. An irrigation corporation formed by owners of arid lands contracted with a contractor to construct an irrigation system in accordance with plans, indicating that 55 acres of a tract of 56.12 acres of an owner would be irrigated. The owner executed a note and mortgage for her share of the cost. Subsequently a new agreement between the corporations and the contractor was made, whereby only 44 acres of the tract could be irrigated. The owner refused to give a new note and mortgage pursuant to the new agreement. The contractor constructed the system in accordance with the new agreement. The corporation knew of the owner's refusal before any work was done. *Held*, that the system constructed under the new agreement was materially different from the system called for by the original agreement, and the note and mortgage were not enforceable at the suit of the corporation.

[As to right to set up total or partial failure of consideration as defense under general issue or denied in action on negotiable instrument, see note in Ann. Cas. 1913B, 318.]

From Malheur: DALTON BIGGS, Judge.

In Banc.    Statement by MR. JUSTICE HARRIS.

The owners of certain arid lands in Malheur County caused the creation of the Kingman Colony Irrigation

Company, a private corporation, for the purpose of constructing and maintaining pumping plants and a system of ditches for the irrigation of accessible lands owned by the stockholders.   Neither the plaintiff nor the land owners possessed sufficient available money with which to undertake the immediate installation of the irrigation plant, and for that reason, in August, 1911, the Kingman Colony Irrigation Company entered into a contract with James A. Green & Co., Inc., a corporation, whereby the latter agreed to construct the irrigation system.   For the sake of brevity the plaintiff will be referred to as the Irrigation Company, and the James A. Green & Co., Inc., will be known as the contractor.   The written agreement made in August, 1911, provides that the contractor shall construct the irrigation system in accordance with definite plans and specifications, which are made a part of the agreement; the writing also has blue-prints attached to it, showing the lands to be served by the proposed irrigation system, and clearly indicating the ''approximate location of ditches, flumes and syphons.''   The contractor agreed to construct the plant for $65,870, to be paid in notes and mortgages which were to be accompanied by certificates of the capital stock of the Irrigation Company.   The scheme outlined by the contract required the Irrigation Company to go to the owners of the lands which were to be irrigated and cause those persons to give notes, secured by mortgages on the lands mentioned, the amount of each note being ascertained by figuring the acreage owned by the maker at the rate of $25 per acre.   The Irrigation Company agreed to issue to each mortgagor a certificate, representing a number of shares of the capital stock of the Irrigation Company ''equal to the number of acres in the tract of land mortgaged.''   The notes and

mortgages, together with the certificates of stock as additional security, were to be placed in the hands of George W. Fletcher as trustee, who was to pay for the construction of the irrigation system by delivering to the contractor $65,870 in notes, together with the mortgages and certificates of stock given as security for the respective notes; and any notes, mortgages and securities remaining after paying the contractor were to be turned over to the Irrigation Company.

The defendant owns a tract of land which originally embraced 60.81 acres; but 4.69 acres were appropriated for a railroad right of way, which enters the premises at a point east of the center of the north line, runs southerly and diagonally through the property, and so divides the land as to leave two strips, one on the west and one on the east side of the railroad, which aggregate 56.12 acres. On September 18, 1911, the defendant executed her promissory note for $1,375, and she also executed notes to evidence the interest which was to become due on the principal note. The notes were secured by a mortgage on the defendant's land, which is described as ''containing fifty-five (55) acres more or less.'' The notes and the mortgage were delivered to the Irrigation Company, and it in turn delivered them to George W. Fletcher as trustee.

The Irrigation Company and the contractor made a new agreement on November 8, 1911, for the reason that it had been ascertained that title had failed to some of the land embraced in the contract of August, 1911, and on that account it was not deemed practical to complete the irrigation system as originally planned. The new contract was in effect the same as the agreement dated August, 1911, except that in the former two pumping stations with their connecting ditches were eliminated and the contract price was reduced to

$46,500. While it preserves the plan that had been devised for paying the contractor, the second agreement contains the following provisions, which do not appear in the first:

"It is understood and agreed, however, that in any case where all of each smallest legal subdivision of the land covered by any mortgage shall not be susceptible of irrigation from the irrigation system to be installed under this contract, in that event, the company may withdraw the same from the trustee and substitute other mortgages covering the exact acreage of such lands so susceptible of irrigation, after the same shall be determined from the definite location of the said canals."

—and, referring to the issuance of the certificates of capital stock, it is stipulated that the "certificates shall be issued by the Irrigation Company as soon as the contractor shall notify the company of the exact acreage in the various tracts of land susceptible of irrigation from the several canals aforesaid according to the definite location thereof."

After making the second contract the Irrigation Company represented to the defendant that it had been ascertained that only 44 acres of her land would be watered and, as substitutes for the notes and mortgage dated September 18, 1911, requested her to sign new notes for $1,100 and to secure the paper by a mortgage on the 44 acres which were to be irrigated. The defendant declined to execute the proposed new notes and mortgage. In August, 1912, the contractor completed the irrigation system under the terms of the second contract, and was paid in the manner provided for by the agreement, and then the Irrigation Company received from George W. Fletcher, the trustee, the

78 Or.—16

notes and mortgage which had been signed by the defendant on September 18, 1911. At some time between November 8, 1911, when the second contract was made with the contractor, and July 15, 1912, certificates representing 44½ shares of the capital stock of the Irrigation Company were issued for the benefit of the defendant, but she never accepted them. The complaint alleges that the stock is of the value of $25 per share, although the certificates of stock, which are in evidence, recite the par value to be $20 per share. The board of directors, in October, 1913, levied an assessment against the stock issued by the Irrigation Company to defray the expenses of operating the irrigating system, $94.27 being the amount charged against the 44½ shares which had been issued in the name of defendant.

The plaintiff commenced this suit on March 5, 1914, and seeks to recover on the notes dated September 18, 1911. It is alleged that 44½, instead of 55, shares of stock were issued for defendant, and that $262.50, the value of 10½ shares not issued, should be credited on the principal of the note, leaving a balance of $1,112.50, which is due, with interest, on account of the failure of defendant to comply with the provisions of the writing. The plaintiff demands a judgment for $1,112.50, with interest, for $94.27 to cover the assessment against the stock, and a decree foreclosing the mortgage on the land and shares of stock. The testimony was taken and reported by a referee. The decree was against the defendant, Retta Payne, who appealed.                                    REVERSED.

For appellant there was a brief with oral arguments by *Mr. William H. Brooke* and *Mr. Ralph W. Swagler*.

For respondent there was a brief with oral arguments by *Mr. John W. McCulloch* and *Mr. Wells W. Wood*.

MR. JUSTICE HARRIS delivered the opinion of the court.

1. The decision of this controversy depends largely upon the conversation and agreement of the parties at the time the defendant signed the notes and mortgage on September 18, 1911. The Irrigation Company takes the position that the transaction was preliminary, and that the parties agreed that the defendant would execute new notes and another mortgage in lieu of the ones delivered on September 18th if it should be ascertained, after making a final survey, that the irrigable acreage amounted to less than 55 acres. The defendant asserts that she understood that the business was completed when she signed and delivered the papers on September 18th; that she executed the instruments upon representations made by the Irrigation Company, and with the understanding that 55 acres of her land would be irrigated from the ditches as they were mapped upon the blue-prints; and that she was warranted in refusing to sign the new notes and mortgage. She also argues that the notes and mortgage sued upon are ineffective because the irrigation system was not substantially completed as originally planned, and for the further reason that both the plaintiff and defendant abandoned all agreements appertaining to the land owned by the latter. A. E. Wade conducted the negotiations for the Irrigation Company. The defendant had purchased the land in 1910 through Wade, who had acted as the agent of the owner; and, when discussing the irrigation pro-

ject in September, 1911, the defendant knew that he was familiar with the premises because she had examined the land in company with him in 1910, when she purchased the property. An action for the condemnation of the railroad right of way had been terminated only a few days before September 18, 1911, and for that reason the number of acres was fresh in the mind of defendant. Retta Payne testified that she knew that a small piece in the northwest corner could not be irrigated, and that Wade told her that it amounted to about half an acre. The defendant in not uncertain terms repeatedly states that it was represented to her that 55 acres of the land would be watered. She is corroborated by the testimony of her son, who says that Wade told him:

"There would be something in the neighborhood of an acre waste, and that the balance of it would be irrigated."

The attorney who advised with Mrs. Payne and as a notary public took the acknowledgment of the mortgage confirms the version given by defendant because it appears from his testimony that:

"During some of those conversations Mr. Wade—I don't remember the details, just exactly how he stated it, but he said something to the effect that there was to be 55 acres of her land irrigated at that time. We had, of course, discussed the acreage and the situation with reference to the railroad, and something was said with reference to the northwest corner, a part of an acre, or something of that kind, that would not be irrigated, and it was estimated that 55 acres would cover approximately the amount of land which would be irrigated."

Although Wade testified that he did not represent that the system which it was proposed to construct

"would cover all her land"—nor does the defendant claim that he so represented to her—nevertheless, he could not positively say that he had said anything to her "about afterward changing this mortgage and her notes in any way"; and the witness further stated: "I believe that I explained that matter to her; I couldn't say absolutely." It is not asserted by anyone that the representations made by plaintiff involved the element of fraud. The inquiry is directed only to what was said, making it necessary to discover whether the plaintiff stated that the system would water 55 acres. The position taken by the defendant is supported by the clear preponderance of the evidence, especially when it is remembered that she knew that she owned 56.12 acres of land and the mortgage only called for 55 acres, as this circumstance of itself indicates that there was some reason for naming less than the entire acreage owned by the mortgagor.

2. The defendant further contends that the litigating parties considered that their contract had been abandoned. The evidence does not definitely disclose the date when the Irrigation Company presented the new notes and mortgage for the signature of defendant, although it was at some time after November 8, 1911, when the second agreement was made with the contractor; and it occurred before the contractor had begun work, because actual construction commenced "in April, 1st of April—it might have been earlier than that." The defendant testified that she first learned of the second agreement with the contractor when the representative of the Irrigation Company presented the proposed new notes and mortgage, and "stated to me that they wouldn't be able to irrigate so many acres as they had said, 55 acres, and that he

wanted me to fill out these, make new arrangements with him."

She wished to inspect the second agreement with the contractor, and a copy was sent to her. After examining the writing and discovering that the system would accommodate a smaller area of her land than at first planned, she determined not to sign the notes and mortgage. Interviews with representatives of the Irrigation Company ended by the defendant saying that she would not execute the new instruments, and the plaintiff was made aware of her intention before construction work commenced. Under these circumstances the defendant had a right to assume that the Irrigation Company had abandoned the agreement with her, because she did not again hear from the plaintiff until the expiration of two years, although in the meantime the irrigation system had been constructed, was being operated, and an assessment against the stock had been levied in October, 1913.

3. It is the contention of the Irrigation Company that the change in the agreement with the contractor did not affect the lands owned by defendant, and that for all practical purposes the Payne land is served by ditches which were constructed as originally planned. One ditch is located west of the railroad right of way, and cuts across the northwest corner of the land so as to leave a triangular piece of about 12 acres to the west of this ditch. There is testimony in behalf of the plaintiff to the effect that one ditch comes to the south line of the premises at a point east of the railroad. It is also claimed that ditch No. 5 is constructed almost to the north line of the Payne land, notwithstanding the fact that witnesses for the defendant, one of them being a civil engineer who went upon the land for the express purpose of ascertaining and mapping the exact

conditions, were positive in their declarations that they could not see any such ditch. The most that plaintiff can claim for these three ditches is that the one west of the railroad will water 37½ acres, a portion of which is east of the railroad; that the ditch coming from the south will irrigate 2 acres, and the one coming from the north will serve 5 acres. It is conceded that the ditch running across the northwest corner is on a line the elevation of which is above all the land lying east of that ditch; but it also appears that it would be very expensive, and therefore not practical, to carry the water over or under the right of way for use on the east side of the railroad. The plan exhibited to the defendant when she signed the notes and mortgage indicated that ditch No. 5 would enter the north side of the Payne land and be extended almost to the south line, and that from this ditch the defendant could irrigate the land east of the right of way without being compelled to adopt an expensive system of syphons for conducting the water from the ditch running across the northwest corner. The specifications remove all doubts that may be raised from a mere inspection of the blue-prints, and demonstrate that according to the original contract ditch No. 5 was to be extended through the land of defendant and almost to the south line, for it is specified that this ditch shall be "one mile" in length; and it appears that if the ditch terminated at the north line it would be only about five-eighths of a mile long. The right to water 55 acres of her land with a system which was defined and made certain and was to be furnished by plaintiff constituted the consideration for the notes and mortgage signed by defendant. The system constructed is materially different from the one promised, and that material difference affects the lands of

defendant to a marked degree; and, furthermore, the plant as now installed, even by the employment of expensive and impracticable methods, will serve only four-fifths of the acreage agreed upon when the notes and mortgage were signed on September 18, 1911: *Foeller* v. *Heintz,* 137 Wis. 169 (118 N. W. 543, 24 L. R. A. (N. S.) 327).

The Irrigation Company had ample notice, before commencing actual construction, that the defendant refused to be bound by the second agreement made with the contractor, and it was not warranted in proceeding with the second contract in despite of the objection made by defendant, so as to make her liable for something she not only did not agree to, but which she expressly repudiated in advance. The plaintiff refused to proceed with the first agreement, while the defendant declined to enter into a new one. The contract actually made was terminated by abandonment, and no new agreement was adopted as a substitute: *Davis* v. *Bronson,* 2 N. D. 300 (50 N. W. 836, 33 Am. St. Rep. 783, 16 L. R. A. 655). The notes and mortgage signed by the defendant and mentioned in the complaint are canceled.

The decree of the trial court is reversed.

REVERSED.